FORM B104 (08/07)                                                                                                    2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS<br>GemCap Lending I, LLC, a Delaware limited liability company | DEFENDANTS<br>Marc Spizzirri, an individual |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Dan E. Chambers, Chambers Law Firm, P.C.<br>2600 Michelson Drive, Suite 1700, Irvine, CA 92612<br>Telephone: 949-852-3540 | ATTORNEYS (If Known)<br>Mike D. Neue, Lobel, Neue & Till, LLP<br>840 Newport Center Dr., Suite 750, Newport Beach, CA 92660<br>Telephone: 949-999-2868 |
| PARTY (Check One Box Only)<br>□ Debtor  □ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor  □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>☑ Debtor  □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor  □ Other<br>□ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Non-dischargeability, 11 U.S.C. sections 523(a)(2)(B) and (a)(6)

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**

□ 11-Recovery of money/property - §542 turnover of property

□ 12-Recovery of money/property - §547 preference

□ 13-Recovery of money/property - §548 fraudulent transfer

□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**

□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**

□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**

□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**

□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**

□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims

☑ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud

□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**

□ 61-Dischargeability - §523(a)(5), domestic support

☑ 68-Dischargeability - §523(a)(6), willful and malicious injury

□ 63-Dischargeability - §523(a)(8), student loan

□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)

□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**

□ 71-Injunctive relief – imposition of stay

□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**

□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**

□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**

□ 01-Determination of removed claim or cause

**Other**

□ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.

□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 348,211.17 |

Other Relief Sought
Determination of non-dischargeability; prejudgment interest; attorneys' fees; litigation costs

FORM B104 (08/07), page 2                                                    2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>Marc Joseph Spizzirri | | BANKRUPTCY CASE NO.<br><br>8:13-bk-14702MW |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Central District of California | DIVISIONAL OFFICE<br><br>Santa Ana | NAME OF JUDGE<br><br>Mark S. Wallace |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*Dan E. Chambers* | | |
| DATE<br><br>9/9/13 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Dan E. Chambers | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Dan E. Chambers (State Bar No. 156853)<br>Chambers Law Firm, P.C.<br>2600 Michelson Drive, Suite 1700<br>Irvine, CA 92612<br>Telephone: 949-852-3540<br>Facsimile: 949-852-3501<br>Email: dchambers@clfca.com | |
| *Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| In re:<br>Marc Joseph Spizzirri | CASE NO.: 8:13-bk-14702-MW |
|---|---|
| | CHAPTER: 11 |
| Debtor(s). | ADVERSARY NUMBER: |
| GemCap Lending I, LLC, a Delaware limited liability company,<br><br>Plaintiff(s)<br>Versus<br>Marc Spizzirri, an individual<br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is _____. If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| Hearing Date: _____<br>Time: _____<br>Courtroom: _____ | Place:<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |
|---|---|

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
      Deputy Clerk

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2012                         Page 2                    F 7004-1.SUMMONS.ADV.PROC

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Date | Printed Name | Signature |
|---|---|---|

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2012      Page 3      **F 7004-1.SUMMONS.ADV.PROC**

1  CHAMBERS LAW FIRM, P.C.
   Dan E. Chambers (State Bar No. 156853)
2  2600 Michelson Drive Suite 1700
   Irvine, CA 92612
3  Telephone:    949-852-3540
   Facsimile:    949-852-3501
4  Email: dchambers@clfca.com

5

   Attorneys for Creditor
6  GemCap Lending I, LLC

7

8              UNITED STATES BANKRUPTCY COURT

9        CENTRAL DISTRICT OF CALIFORNIA—SANTA ANA DIVISION

10

11 | In Re                                    | Case No.  8:13-bk-14702-MW

12 | Marc Joseph Spizzirri,                   | Chapter 11

13 |                 Debtor.                  | Adversary No. _____

14

15 | GEMCAP LENDING I, LLC, a Delaware        | **COMPLAINT FOR EXCEPTION TO
   | limited liability company,               | DISCHARGE UNDER 11 U.S.C. § 523**
16 |
   |                 Plaintiff,               | (Hearing Date to be Set by
17 |                                          | Summons)

18 |        v.

19 |
   | MARC SPIZZIRRI, an individual,
20 |
21 |                 Defendant.

22

23        Plaintiff GemCap Lending I, LLC, a Delaware limited liability company ("GEMCAP"

24 and/or "Plaintiff"), alleges and complains as follows:

25                              **PARTIES**

26        1.     At all times relevant hereto, GEMCAP is and was a limited liability company

27 organized and existing under the laws of the State of Delaware with its principal place of business

28 in the County of Los Angeles, State of California.

                                   - 1 -

                      COMPLAINT FOR NON-DISCHARGEABILITY

1    2.    GEMCAP is informed and believes, and based thereon alleges, that defendant

2  MARC JOSEPH SPIZZIRRI ("SPIZZIRRI" or "Defendant") is, and at all times relevant hereto

3  was, an individual residing in the County of Orange, State of California.

4                          **JURISDICTION AND VENUE**

5    3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

6  §§ 157 and 1334(b). This adversary proceeding presents a core proceeding with respect to which

7  the Court may enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(A), (I) and (O).

8    4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9                          **FACTUAL BACKGROUND**

10                          **The Primary Indebtedness**

11    5.    There exists a certain Loan Agreement (the "Loan") dated August 14, 2012, by

12  and between GEMCAP, on the one hand, and Family Collectibles, Inc. ("Family Collectibles")

13  and Family Classic Cars Corporation ("Family Classic" and collectively with Family Collectibles,

14  the "Borrower"), on the other hand. A true and correct copy of the Loan is attached hereto as

15  Exhibit 1 and incorporated herein by reference.

16    6.    Concurrently with the execution of the Loan, GEMCAP and Borrower executed a

17  Loan Agreement Schedule (the "Schedule") that contained certain other terms and conditions of

18  Loan. A true and correct copy of the Schedule is attached hereto as Exhibit 2 and incorporated

19  herein by reference.

20    7.    Under the Loan, Borrower promised, *inter alia*, to pay GEMCAP the outstanding

21  principal balance of the Loan, in a maximum amount of $3 million, plus all unpaid accrued

22  interest, on August 14, 2014 (the "Maturity Date"). Borrower further agreed to certain make

23  monthly or regular payments of all accrued unpaid interest and other charges pursuant to the

24  terms and conditions set forth in the Loan and the Schedule. The use of the proceeds of the Loan

25  was governed by the terms and conditions set forth in the Schedule.

26    8.    As part of the Loan, GEMCAP received a blanket lien on all assets of Family

27  Collectibles and Family Classic, which GEMCAP perfected by the filing of a UCC1 Financing

28  Statement.

- 2 -

1    9.    The Loan expressly states that the following constitutes an event of default under

2    the Loan: "The failure by Borrower to pay, when due, (a) any payment of principal, interest or

3    other charges due and owing to Lender pursuant to any obligations of Borrower to Lender

4    including, without limitation, those Obligations arising pursuant to this Agreement or any Loan

5    Document, or under any other agreement for the payment of monies then due and payable to

6    Lender, or (b) any taxes due to any Governmental Authority."

7                                        **The Guarantee**

8    10.    On or about August 14, 2012, in order to induce GEMCAP to make the Loan to

9    Borrower, SPIZZIRRI (the "Guarantor") executed a Continuing Guarantee in favor of GEMCAP.

10    A true and correct copy of the Guarantee is attached hereto as Exhibit 3 and incorporated herein

11    by reference.

12    11.    Under the terms of the Guarantee, SPIZZIRRI:

13    (a)    Absolutely and unconditionally guaranteed full and punctual payment and

14    satisfaction of the indebtedness of Borrower to GEMCAP, and the performance and discharge of

15    all Borrower's obligations under the Loan and the related documents;

16    (b)    Unconditionally guaranteed and promised to fulfill on demand, in the event

17    of Borrower's default on any of the obligations owing to GEMCAP, all such obligations; and

18    (c)    Waived all available guarantor and suretyship defenses to enforcement of

19    their individual obligations to repay GEMCAP's debt, all as set forth in the Guarantee.

20                    **Spizzirri Submits False Financial Statements to GEMCAP**

21    12.    In connection with obtaining the Loan, on behalf of Borrower and acting as its

22    president, SPIZZIRRI submitted several financial statements to GEMCAP that contained false

23    and misleading information. GEMCAP reasonably and actually relied on the truthfulness and

24    completeness of these financial statements in its decision to make the Loan to Borrower. If

25    GEMCAP had known that the financial statements contained false or misleading information,

26    GEMCAP would not have made the Loan to Borrower.

27    13.    In or about June 2012, as part of the underwriting and due diligence process for the

28    Loan, SPIZZIRRI submitted to GEMCAP a financial statement for the period ending December

- 3 -

1   31, 2011 (the "2011 Financial Statement"). In the 2011 Financial Statement, SPIZZIRRI

2   represented to GEMCAP that one of the assets of Family Collectibles was a "coin collection"

3   valued at $90 million.

4   14.   By virtue of the sheer amount of the alleged "coin collection (i.e., $90 million),

5   even if the collection had an auction value of 10% of the book value (i.e., $10 million), GEMCAP

6   was induced to make the loan because the maximum loan amount was $3 million and GEMCAP

7   had a blanket lien on all assets of Borrower, including the "coin collection."

8   15.   In or about June 2012, as part of the underwriting and due diligence process for the

9   Loan, SPIZZIRRI submitted to GEMCAP a financial statement for the period up to March 31,

10  2012 (the "March 2012 Financial Statement"). The March 2012 Financial Statement was

11  specifically relied upon by GEMCAP in its decision to make the Loan to Borrower. In the March

12  2012 Financial Statement, SPIZZIRRI continued to represent to GEMCAP that one of the assets

13  of Family Collectibles was the $90 million "coin collection."

14  16.   In or about April 2013, as part of the Borrower's financial reporting requirements

15  under the terms and conditions of the Loan and the Schedule, SPIZZIRRI submitted to GEMCAP

16  a financial statement for the period up to February 28, 2013 (the "February 2013 Financial

17  Statement"). In the February 2013 Financial Statement, SPIZZIRRI continued to represent to

18  GEMCAP that one of the assets of Family Collectibles was the $90 million "coin collection."

19  17.   In or about March 2013, SPIZZIRRI contacted GEMCAP and asked about

20  obtaining another loan that would be separately secured by the "coin collection." GEMCAP

21  stated that it would consider making such a Loan based upon the represented value of the "coin

22  collection" but that GEMCAP needed details concerning the "coin collection" including, but not

23  limited to, an appraisal of the value of the "coin collection." Between May 24 and March 26,

24  2013, SPIZZIRRI provided an appraisal for the "coin collection" which showed that the "coin

25  collection" was an asset of an entity called "Coin Collateral & Equity, LLC."

26  18.   GEMCAP immediately confronted SPIZZIRRI with this discrepancy. SPIZZIRRI

27  never provided an explanation to GEMCAP. Instead, on or about May 30, 2013, the same day

28  that SPIZZIRRI filed this bankruptcy case, he provided GEMCAP with a financial statement for

- 4 -

1    the period up to March 31, 2013 (the "March 2013 Financial Statement"). In the March 2013

2    Financial Statement, SPIZZIRRI omitted the $90 million "coin collection" from the assets of

3    Family Collectible.

4        19.    GEMCAP is informed and believes, and based thereon alleges, that SPIZZIRRI

5    provided false financial statements to GEMCAP that included the "coin collection" as an asset of

6    Family Collectible in order to induce GEMCAP to provide the Loan and to induce GEMCAP to

7    make a separate Loan secured by the "coin collection" when, in fact, the "coin collection" was an

8    asset of a different entity. SPIZIRRRI concealed this false information from GEMCAP and

9    intended to deceive, defraud and cause harm to GEMCAP.

10       20.    GEMCAP is informed and believes, and based thereon alleges, that the various

11   written financial statements that SPIZZIRRI provided to GEMCAP contained other false

12   information upon which GEMCAP relied and that induced GEMCAP to make the Loan to

13   Borrower.

14   **Borrower Default**

15       21.    Borrower failed to make the required payments due under the Loan and failed to

16   perform other terms and conditions of the Loan and the Schedule. On May 20, 2013, GEMCAP

17   provided Borrower with written notice of its defaults. A true and correct copy of the notice sent

18   to Borrower is attached hereto as Exhibit 4 and incorporated herein by reference.

19       22.    GEMCAP also made a demand on SPIZZIRRI to perform Borrower's obligations

20   as required under the terms and conditions of the Guarantee. A true and correct copy of the

21   notice sent to SPIZZIRRI is attached hereto as Exhibit 5 and incorporated herein by reference.

22       23.    Despite receipt of the notice of default and acceleration, Borrower and SPIZZIRRI

23   failed to cure the specified defaults.

24       24.    On May 30, 2013, SPIZZIRRI filed a voluntary chapter 11 bankruptcy petition,

25   commencing the above-captioned bankruptcy case.

26       25.    On June 17, 2013, GEMCAP held a public sale of its collateral, which consisted of

27   all the Borrower's tangible and intangible assets pursuant to the California Commercial Code. On

28   the date of the auction, the loan amount equaled $3,576,211.17. The highest and only bid at the

- 5 -

1    auction was $3,228,000.00, leaving a deficiency of $348,211.17.

2                          **FIRST CLAIM FOR RELIEF**

3              **Exception to Discharge under 11 U.S.C. § 523(a)(2)(B)**

4         26.      GEMCAP incorporates by reference the foregoing paragraphs 1 through 25,

5    inclusive, as though set forth in full.

6         27.      Between June 2012 and May 2013, in connection with obtaining the Loan,

7    SPIZZIRRI provided written financial statements to GEMCAP concerning the financial condition

8    of Family Collectibles that were materially false and fraudulent.

9         28.      GEMCAP is informed and believes that SPIZZIRRI grossly inflated the value of

10    the assets of Family Collectibles in these written financial statements by including the "coin

11    collection" as an asset of Family Collectibles when, in fact, the "coin collection" was owned by

12    another entity.

13        29.      At the time these representations were made and the written financial statements

14    were provided to GEMCAP, SPIZZIRRI knew that the representations and financial statements

15    were false, and made the representations in order to mislead GEMCAP and to induce GEMCAP

16    to enter into the Loan with Borrower.

17        30.      At the time these representations were made and the written financial statements

18    were provided to GEMCAP, SPIZZIRRI acted with the intention and purpose of deceiving and

19    defrauding GEMCAP.

20        31.      GEMCAP justifiably and reasonably relied on the false representations made by

21    SPRIZZIRRI and false financial statements provided by SPIZZIRRI in GEMCAP's decision to

22    make the Loan.

23        32.      As a direct and proximate result of SPIZZIRRI's false representations, GEMCAP

24    has been damaged in an amount of at least $348,211.17, to be proven at trial.

25                         **SECOND CLAIM FOR RELIEF**

26              **Objection to Discharge under 11 U.S.C. § 523(a)(6)**

27        33.      GEMCAP incorporates by reference the foregoing paragraphs 1 through 25,

28    inclusive, as though set forth in full.

                                    - 6 -

34.     Between June 2012 and May 2013, in connection with obtaining the Loan, SPIZZIRRI provided written financial statements to GEMCAP concerning the financial condition of Family Collectibles that were materially false and fraudulent.

35.     GEMCAP is informed and believes that SPIZZIRRI grossly inflated the value of the assets of Family Collectibles in these written financial statements by including the "coin collection" as an asset of Family Collectibles when, in fact, the "coin collection" was owned by another entity.

36.     At the time these representations were made and the written financial statements were provided to GEMCAP, SPIZZIRRI knew that the representations and financial statements were false, and made the representations in order to mislead GEMCAP and to induce GEMCAP to enter into the Loan with Borrower.

37.     At the time these representations were made and the written financial statements were provided to GEMCAP, SPIZZIRRI acted with the intention and purpose of deceiving and defrauding GEMCAP.

38.     At the time these representations were made and the written financial statements were provided to GEMCAP, SPIZZIRRI had the subjective intent to cause harm to GEMCAP and knew that injury to GEMCAP was substantially certain to occur as a result of his conduct.

39.     SPIZZIRRI's commission of these wrongful acts alleged herein were malicious because they were done intentionally, necessarily caused injury to GEMCAP and were committed without just cause or excuse.

40.     GEMCAP justifiably and reasonably relied on the false representations made by SPRIZZIRRI and false financial statements provided by SPIZZIRRI in GEMCAP's decision to make the Loan.

41.     As a direct and proximate result of SPIZZIRRI's false representations and willful and malicious conduct, GEMCAP has been damaged in an amount of at least $348,211.17, to be proven at trial.

## PRAYER

**WHEREFORE,** GEMCAP prays for judgment against SPIZZIRRI as follows:

- 7 -

1.    A determination that SPIZZIRRI is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(2)(B);

2.    A determination that SPIZZIRRI is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6);

3.    For prejudgment interest in the maximum allowed under applicable law;

4.    For attorneys' fees to the fullest extent allowed by applicable law;

5.    For costs of suit incurred herein;

6.    For such other and further relief as the Court deems just and proper.


Dated: September 9, 2013                    TROUTMAN SANDERS LLP


                                            By: /s/ Dan E. Chambers
                                                Dan E. Chambers
                                                Attorneys for Creditor GemCap
                                                Lending I, LLC

- 8 -

COMPLAINT FOR NON-DISCHARGEABILITY

# EXHIBIT 1

Exhibit __1__ Page __9__

EXECUTION COPY

# LOAN AND SECURITY AGREEMENT

by and between

## GEMCAP LENDING I, LLC

as Lender

and

## FAMILY COLLECTIBLES, INC. AND FAMILY CLASSIC CARS CORPORATION,

jointly and severally,

as Borrower

Dated: August 14, 2012

{00154593.DOC; 1}

Exhibit __1__ Page __10__

EXECUTION COPY

## LOAN AND SECURITY AGREEMENT

**LOAN AND SECURITY AGREEMENT**, dated as of August 14, 2012, by and between FAMILY COLLECTIBLES, INC., a California corporation ("Collectibles") and FAMILY CLASSIC CARS CORPORATION, a Nevada corporation ("Classic Cars" and, jointly and severally with Collectibles, "**Borrower**"), and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**").

### RECITALS:

**WHEREAS**, Borrower desires to enter into a credit facility with Lender; and

**WHEREAS**, Lender is willing to establish such credit facility on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

### SECTION 1. DEFINITIONS AND RULES OF INTERPRETATION AND CONSTRUCTION

**Specific Terms Defined.** Capitalized terms used herein and not otherwise defined have the following meanings:

1.1 **"Account Debtor" or "account debtor"** has the meaning ascribed to such term in the UCC.

1.2 **"Accounts" or "accounts"** means "accounts" as defined in the UCC, and, in addition, any and all obligations of any kind at any time due and/or owing to Borrower, whether now existing or hereafter arising, and all rights of Borrower to receive payment or any other consideration including, without limitation, invoices, contract rights, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments and all other debts, obligations and liabilities in whatever form owing to Borrower from any Person, Governmental Authority or any other entity, all security therefor, and all of Borrower's rights to receive payments for goods sold (whether delivered, undelivered, in transit or returned) or services rendered, which may be represented thereby, or with respect thereto, including, but not limited to, all rights as an unpaid vendor (including stoppage in transit, replevin or reclamation), and all additional amounts due from any Account Debtor, whether or not invoiced, together with all Proceeds and products of any and all of the foregoing.

1.3 **"ACH"** has the meaning set forth in Section 2.5 hereof.

1.4 **"Advance"** has the meaning as set forth in Section 1(c)(ii) of the Loan Agreement Schedule.

1.5 **"Affiliate"** means, with respect to any Person, (a) any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person or (b) any other

{00154593.DOC; 1}

Exhibit __1__ Page __11__

Person who is a director, manager or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management or the policies of such Person, whether through the ownership of any voting securities, by contract or otherwise.

1.6    **"Agreement"** means this Loan and Security Agreement (including the Loan Agreement Schedule delivered herewith), all Exhibits annexed hereto and the Borrower's Disclosure Schedule) as originally executed or, if amended, modified, supplemented, renewed or extended from time to time, as so amended, modified, supplemented, renewed or extended.

1.7    **"Appraisal"** means the appraisal, based on Appraised Net Orderly Liquidation Value, dated August 6, 2012 and annexed hereto as **Exhibit 1.7,** and, in the case of vehicles purchased after the date hereof and approved by Lender as Rolling Stock in accordance with Section 5.4(j) hereof, Lender's then most current appraisal of such vehicles.

1.8    **"Appraised Net Orderly Liquidation Value"** means a professional opinion of the estimated most probable net amount expressed in terms of currency which could typically be realized when assets are sold piecemeal, through negotiation, over a predetermined period of time by an experienced liquidator and under present day economic trends, as of the effective date of the appraisal report after all direct sale expenses have been deducted. Orderly liquidation value assumes that the buyer is responsible for all removal costs and is purchasing the assets "as is, where is'" with no warrantees or representations as to the condition of the assets being made by the seller. It is further assumed that the assets are properly advertised in a manner considered to be commercially reasonable. Buyer and seller further acknowledge that if an acceptable price cannot be negotiated within the time period specified the final option would be to offer the assets for sale at public auction. Not considered in the sale expenses are attorney fees, building repairs, maintenance, etc. that are not under the liquidator's control. Conclusions taken into consideration are physical location, difficulty of removal, physical condition, adaptability, specialization, marketability, overall appearance and psychological appeal. Further, the ability of the asset group to draw sufficient prospective buyers to insure competitive offers is considered. The licensed and experienced liquidator is assuming in their evaluation that all equipment will be free of hazardous waste at the time of sale.

1.9    **[RESERVED]**

1.10    **Availability"** means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) Three Million Dollars ($3,000,000).

1.11    **"Balance Sheet"** means the balance sheet of Borrower dated as of the Balance Sheet Date.

1.12    **"Balance Sheet Date"** means   December 31, 2011   .

1.13    **"Borrower"** has the meaning set forth in the introductory paragraph hereof.

{00154593.DOC; 1}

2

Exhibit __1__  Page _12_

EXECUTION COPY

**1.14** "**Borrower's Disclosure Schedule**" means the disclosure schedule prepared by Borrower that is being delivered to Lender concurrently herewith.

**1.15** "**Borrower's Premises**" means the property leased by the Borrower located at 33033 Camino Capistrano, San Juan Capistrano, California 92675.

**1.16** "**Borrowing Base**" shall be calculated at any time as the product obtained by multiplying the Appraised Net Orderly Liquidation Value of then-existing Eligible Inventory, as determined by Lender, by seventy percent (70%).

**1.17** "**Borrowing Certificate**" has the meaning as set forth in <u>Section 1(c)(v) of the Loan Agreement Schedule</u>.

**1.18** "**Business**" means the acquisition, servicing and sale of classic cars.

**1.19** "**Business Day**" means any day other than a Saturday, Sunday or any other day on which banks located in the State of California are authorized or required to close under applicable banking laws.

**1.20** "**Capital Assets**" means, in accordance with GAAP, fixed assets, both tangible (such as land, buildings, fixtures, machinery and equipment) and intangible (such as patents, copyrights, trademarks, franchises and goodwill).

**1.21** "**Change of Control**" has the meaning as set forth in Section 10.1 hereof.

**1.22** "**Chattel Paper**" has the meaning ascribed to such term in the UCC.

**1.23** "**Closing Date**" means the date of this Agreement.

**1.24** "**Collateral**" has the meaning as set forth in Section 5.1 hereof.

**1.25** "**Collection Account**" has the meaning set forth in <u>Section 1(c)(vi) of the Loan Agreement Schedule</u>.

**1.26** "**Collection Days**" means a period equal to the greater of (i) two (2) Business Days after the deposit of Collections into the Collection Account, or (ii) such longer period as may be required by the financial institution with whom the Collection Account is maintained, in either event for which interest may be charged on the aggregate amount of such deposits at the Interest Rate or, if applicable, the Default Interest Rate.

**1.27** "**Collections**" means with respect to any Account, all cash collections on such Account.

**1.28** "**Commercial Tort Claims**" has the meaning ascribed to such term in the UCC.

**1.29** "**Default Interest Rate**" has the meaning set forth in <u>Section 3(b) of the Loan Agreement Schedule</u>.

{00154593.DOC; 1}

3

Exhibit 1 Page 13

1.30    **"Defective Rolling Stock"** has the meaning set forth in <u>Section 7(b)(iv) of the Loan Agreement Schedule</u>.

1.31    **"Deposit Accounts"** has the meaning ascribed to such term in the UCC.

1.32    **"Document" or** "document" has the meaning ascribed to such term in the UCC.

1.33    **"Domain Name Collateral Assignment"** means the Domain Name Collateral Assignment in the form of **Exhibit 1.33** annexed hereto.

1.34    **[RESERVED]**

1.35    **"Eligible Inventory"** shall mean Inventory consisting of Rolling Stock that is owned by Borrower and approved by Lender as Eligible Inventory in Lender's sole and absolute discretion, excluding, however, any Inventory having any of the following characteristics:

    (1) In-transit Inventory;

    (2) Inventory as to which Lender has not received a waiver in form and substance acceptable to Lender from the applicable landlord or warehouseman in respect thereof;

    (3) Inventory not subject to a duly perfected first priority security interest in Lender's favor;

    (4) Inventory that is subject to any Lien in favor of any Person other than Lender that is not subordinate to Lender's first priority security interest on terms satisfactory to Lender in its sole discretion;

    (5) Inventory on consignment from any Person, on consignment to any Person or subject to any bailment;

    (6) Inventory that is damaged, defective or not currently saleable in the normal course of the Borrower's operations;

    (7) Inventory that the Borrower has returned, has attempted to return, is in the process of returning or intends to return to the vendor thereof;

    (8) Inventory not covered by a casualty insurance policy reasonably acceptable to Lender and under which Lender has been named as a loss payee and additional insured;

    (9) Inventory with contra-account liability;

    (10) Inventory that is located at any warehouse or other premises other than (a) Borrower's Premises, or (b) any other premises expressly approved by Lender in writing;

    (11) Inventory as to which Lender has not received copies of bills of sale and original motor vehicle titles naming Lender as secured party in form and substance satisfactory to Lender; and

{00154593.DOC; 1}

4

(12)    Inventory otherwise deemed ineligible by Lender in its sole discretion.

**1.36** "**Environment**" means all air, surface water, groundwater or land, including, without limitation, land surface or subsurface, including, without limitation, all fish, wildlife, biota and all other natural resources.

**1.37** "**Environmental Law**" or "**Environmental Laws**" means all federal, state and local laws, statutes, ordinances and regulations now or hereafter in effect, and in each case as amended or supplemented from time to time, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

**1.38** "**Environmental Liabilities and Costs**" means, as to any Person, all liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit, order or agreement with any Governmental Authority or other Person, and which arise from any environmental, health or safety conditions, or a Release or conditions that are reasonably likely to result in a Release, and result from the past, present or future operations of such Person or any of its Affiliates.

**1.39** "**Environmental Lien**" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

**1.40** "**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

**1.41** "**Equipment**" means "equipment", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and shall include, without limitation, the machinery and equipment set forth on Section 1.41 to the Borrower's Disclosure Schedule annexed hereto, and all other equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and Borrower's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories thereof or thereto, and all substitutions and replacements therefor.

**1.42** "**[RESERVED]**

**1.43** "**Equity Interests**" means, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, membership interests, units, participations or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible

[00154593.DOC; 1]

5

Exhibit __1__ Page __15__

securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC (or any successor thereto) under the 1934 Act).

1.44    **"Event of Default"** means the occurrence or existence of any event or condition described in Section 11 of this Agreement.

1.45    **"Financial Statements"** has the meaning as set forth in Section 8.9 hereof.

1.46    **"Financing Statements"** shall mean the Uniform Commercial Code UCC-1 Financing Statements and filings securing Lender's Liens on all Rolling Stock under applicable certificate of title laws, rules and regulations to be filed with applicable Governmental Authorities of each State or Commonwealth or political subdivisions thereof pursuant to which Lender shall perfect its security interest in the Collateral.

1.47    **"Fiscal Year"** means that twelve (12) month period commencing on January 1 and ending on December 31.

1.48    **"Fixtures"** has the meaning ascribed to such term in the UCC.

1.49    **"GAAP"** means generally accepted accounting principles in effect in the United States of America at the time of any determination, and which are applied on a consistent basis.  All accounting terms used in this Agreement which are not expressly defined in this Agreement shall have the meanings given to those terms by GAAP, unless the context of this Agreement otherwise requires.

1.50    **"General Intangibles"** has the meaning ascribed to such term in the UCC.

1.51    **"Goods"** has the meaning ascribed to such term in the UCC.

1.52    **"Governmental Authority"** or **"Governmental Authorities"** means any federal, state, county or municipal governmental agency, department, instrumentality, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.53    **"Guarantee"** means the Continuing Guarantee of Marc Spizzirri in the form of **Exhibit 1.53** annexed hereto.

1.54    **"Guarantor"** means Marc Spizzirri.

1.55    **"Indebtedness"** means, with respect to any Person, all of the obligations of such Person which, in accordance with GAAP, should be classified upon such Person's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including without limitation, with respect to Borrower, in any event and whether or not so classified:

(a)    all debt and similar monetary obligations of Borrower, whether direct or indirect;

(b)    all obligations of Borrower arising or incurred under or in respect of any guaranties (whether direct or indirect) by Borrower of the Indebtedness of any other Person; and

{00154593.DOC; 1}

Exhibit ___1___ Page _11_

(c)    all obligations of Borrower arising or incurred under or in respect of any Lien upon or in any property owned by Borrower that secured Indebtedness of another Person, even though Borrower has not assumed or become liable for the payment of such Indebtedness.

**1.56**    "**Intellectual Property**" means all of the following intellectual property used in the conduct of the business of Borrower: (a) inventions, processes, techniques, discoveries, developments and related improvements, whether or not patentable; (b) United States patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, of any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) unregistered, United States registered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Borrower; (f) copyrights; (g) work for hire; (h) customer and mailing lists; and (i) any and all rights of the Borrower to the name "FAMILY CLASSIC CARS," "FAMILY COLLECTIBLES," or any derivation thereof, and Borrower's entire customer list and database and all assets used or useful by Borrower in the conduct of its business over the internet or in any electronic medium, including any websites or domain names owned by Borrower.

**1.57**    "**Interest Rate**" means the **Revolving Loan Interest Rate.**

**1.58**    "**Instruments**" has the meaning ascribed to such term in the UCC

**1.59**    "**Inventory**" means "inventory," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and, in any event, shall include, without limitation, all raw materials, work-in-process, finished and semi-finished Inventory including, without limitation, all materials, parts, components and supplies relating to the manufacture or assembly thereof, packaging and shipping supplies relating thereto, and all other inventory, merchandise, goods and other personal property now or hereafter owned by Borrower, including, without limitation, Rolling Stock and other motor vehicles, which are held for sale, exchange or lease or are furnished or are to be furnished under a contract of service or an exchange arrangement or which constitute raw materials, work-in-process or materials used or consumed or to be used or consumed in Borrower's business, or the processing, packaging, delivery or shipping of the same, and all finished goods and the products of the foregoing, whatever form and wherever located; and all names or marks affixed to or to be affixed thereto for purposes of selling same by the seller, manufacturer, lessor or licensor thereof and all right, title and interest of Borrower therein and thereto.

**1.60**    "**Investment Property**" has the meaning ascribed to such term in the UCC.

**1.61**    "**Landlord Waiver and Access Agreement**" means the agreement in the form of **Exhibit 1.61** annexed hereto.

**1.62**    "**Lender**" has the meaning set forth in the introductory paragraph hereof.

{00154593.DOC; 1}

1.63 **"Letter-of-Credit Rights"** means "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not the beneficiary thereof has demanded or is entitled to demand payment or performance.

1.64 **"Lien" or "lien"** means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, lien (statutory or other, including, without limitation, liens imposed by any Governmental Authority,, charge or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures.

1.65 **"Loans"** means the principal amounts advanced to the Borrower as set forth in this Agreement and the Note.

1.66 **"Loan Agreement Schedule"** means the Loan Agreement Schedule dated of even date herewith, signed by Borrower(s) and delivered together with this Agreement, which Loan Agreement Schedule is incorporated herein by reference.

1.67 **"Loan Documents"** means this Agreement, the Loan Agreement Schedule, the Borrower's Disclosure Schedule, the Revolving Loan Note, the Guarantee, the Landlord Waiver and Access Agreement, the Subordination Agreements, the Power of Attorney and any and all other agreements, notes, documents, mortgages, financing statements, guaranties, intercreditor agreements, subordination agreements, certificates and instruments executed and/or delivered by Borrower or any other Person to Lender pursuant to and in connection with the Loans and this Agreement, as the same may be amended, modified, supplemented, renewed or extended from time to time.

1.68 **"Material Adverse Effect"** means a material adverse effect on (a) the Business, assets, liabilities, financial condition, results of operations or business prospects of Borrower, (b) the ability of Borrower or any Guarantor to perform its obligations under any Loan Document to which it is a party, (c) the value of the Collateral or the rights of Lender therein, (d) the validity or enforceability of any of the Loan Documents, (e) the rights and remedies of Lender under any of such Loan Documents, or (f) the timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith. All determinations of materiality shall be made by the Lender in its reasonable judgment.

1.69 **"Material Contract"** means any contract or other arrangement (other than Loan Documents), whether written or oral, to which Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could have a Material Adverse Effect.

1.70 **"Maturity Date"** means August 14, 2014, or such earlier date by which the maturity of the Obligations shall have been accelerated pursuant to the terms hereof.

1.71 **"Maximum Credit"** means $3,000,000.

1.72 **"1934 Act"** means the Securities Exchange Act of 1934, as amended.
{00154593.DOC; 1}

Exhibit __1__ Page _18_

1.73    **"Note"** means the Revolving Loan Note.

1.74    **"Obligations"** means all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Lender pursuant to the Loan Documents, including, without limitation, principal, interest, repurchase obligations, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts which would accrue and become due but for the commencement of such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

1.75    **"Organizational Documents"** means, in the case of a corporation, its Articles of Incorporation, Certificate of Incorporation and By-Laws; in the case of a general partnership, its Articles of Partnership and any partnership agreement; in the case of a limited partnership, its Articles of Limited Partnership and any partnership agreement; in the case of a limited liability company, its Articles of Organization and Operating Agreement or Regulations, if any; in the case of a limited liability partnership, its Articles of Limited Liability Partnership; or alternatively, in each case, the legal equivalent thereof in the jurisdiction of its organization, together with all other formation or governing documents, schedules, exhibits, amendments, addendums, modifications, replacements, additions, or restatements of the foregoing, which are in effect.

1.76    **"Overadvance"** has the meaning as set forth in Section 1(c)(iv) of the Loan Agreement Schedule.

1.77    **[RESERVED]**

1.78    **"Payment Intangibles"** has the meaning ascribed to such term in the UCC.

1.79    **"Permitted Encumbrances"** means the following: (a) Liens granted to Lender or its Affiliates; (b) purchase money security interests in favor of equipment vendors upon any Capital Assets hereafter acquired (including, without limitation, capitalized or finance leases); provided, that, (i) no such purchase money security interest or other Lien (or capitalized or finance lease, as the case may be) with respect to specific future Capital Assets shall extend to or cover any other property, other than the specific Capital Assets so acquired, and the proceeds thereof, (ii) such mortgage, Lien or security interest secures only the cost or obligation to pay the purchase price of such specific Capital Assets only (or the obligations under the capitalized or finance lease), (iii) the principal amount secured thereby shall not exceed one hundred (100%) percent of the lesser of the cost or the fair market value (at the time of the acquisition of the Capital Assets) of the Capital Assets so acquired, and (iv) such purchase money security interest is preapproved in writing by Lender; (c) Liens of carriers, warehousemen, artisans, bailees, mechanics and materialmen incurred in the ordinary course of business securing sums not overdue; (d) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, relating to employees, securing sums (i) not overdue or (ii) being diligently contested in good faith provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; (e) Liens for taxes (i) not yet due or (ii) being diligently contested in good faith by appropriate

{00154593.DOC; 1}

9

EXECUTION COPY

proceedings, provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP, and which have no effect on the priority of Liens in favor of Lender or the value of the assets in which Lender has a Lien; and (f) such other Liens as are set forth on **Exhibit 1.79** annexed hereto and made a part hereof.

1.80    "**Permitted Indebtedness**" means the Indebtedness described in **Exhibit 1.80** annexed hereto.

1.81    "**Person" or "person**" means, as applicable, any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

1.82    "**Power of Attorney**" means the Special Power of Attorney in the form of **Exhibit 1.82** annexed hereto.

1.83    "**Proceeds**" has the meaning ascribed to such term in the UCC and shall also include, but not be limited to, (a) any and all proceeds of any and all insurance policies (including, without limitation, life insurance, casualty insurance, business interruption insurance and credit insurance), indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral or otherwise, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of Governmental Authority) and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

1.84    "**Promissory Note**" has the meaning ascribed to such term in the UCC.

1.85    "**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Substance into the Environment.

1.86    "**Reserves**" means, as of any date of determination, such amounts as Lender  may from time to time establish and revise in good faith reducing the amount of the Revolving Loan Commitment (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may adversely affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, Business or prospects of Borrower, (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (iv) Borrower's ability to perform its Obligations under the Loan Documents; or (b) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

1.87    "**Responsible Officer**" means the Chief Executive Officer, Chief Financial Officer, President, Secretary or Treasurer of Borrower.

1.88    "**Revolving Loan Commitment**" means the difference between (i) Availability and (ii) the sum of the Reserves plus outstanding Obligations.

{00154593.DOC; 1}

10

Exhibit _1_   Page _20_

1.89    **"Revolving Loan Note"** means the Secured Revolving Loan Note in the form of **Exhibit 1.89** annexed hereto.

1.90    **"Revolving Loan Prepayment Fee"** has the meaning set forth in <u>Section 4(b) of the Loan Agreement Schedule</u>.

1.91    **"Revolving Loan Interest Rate"** is as set forth in <u>Section 3(a) of the Loan Agreement Schedule</u>.

1.92    **"Revolving Loans"** has the meaning as set forth in <u>Section 1(c)(i) of the Loan Agreement Schedule</u>.

1.93    **"Rolling Stock"** means the vehicles set forth on **Exhibit 1.93** annexed hereto, and hereafter-acquired vehicles consisting of classic cars, together with all repairs, modifications, alterations, additions and accessories thereof or thereto, and all substitutions and replacements therefor.

1.94    **"Rolling Stock Certificate"** has the meaning set forth in <u>Section 7(b)(iv) of the Loan Agreement Schedule</u>.

1.95    **"SEC"** means the United States Securities and Exchange Commission.

1.96    **"Securities"** has the meaning ascribed to such term in the UCC.

1.97    **"Software"** has the meaning ascribed to such term in the UCC.

1.98    **"Subordination Agreements"** means the Subordination Agreements in the forms of **Exhibit 1.98(a)** and **Exhibit 1.98(b)** annexed hereto, executed by each of John Cappelletti and Marc Spizzirri.

1.99    **"Subsidiary"** means, as to any Person, a corporation, limited liability company or other entity with respect to which more than fifty (50%) percent of the outstanding Equity Interests of each class having voting power is at the time owned by such Person or by one or more Subsidiaries of such Person or by such Person.

1.100   **"Tangible Chattel Paper"** has the meaning ascribed to such term in the UCC.

1.101   **"Tax"** has the meaning set forth in Section 8.12(c).

1.102   **"Tax Deduction"** has the meaning set forth in Section 8.12(c).

1.103   **"Term"** has the meaning set forth in Section 4.1.

1.104   **"UCC"** means the Uniform Commercial Code as presently enacted in California (or any successor legislation thereto), and as the same may be amended from time to time, and the state counterparts thereof as may be enacted in such states or jurisdictions where any of the Collateral is located or held.

{00154593.DOC; 1}

11

**1.105  Rules of Interpretation and Construction.**  In this Agreement unless the context otherwise requires:

(a)     All terms used herein which are defined in the UCC  shall have the meanings given therein unless otherwise defined in this Agreement;

(b)     Sections mentioned by number only are the respective Sections of this Agreement as so numbered;

(c)     Words importing a particular gender shall mean and include the other gender and words importing the singular number mean and include the plural number and vice versa;

(d)     Words importing persons shall mean and include firms, associations, partnerships (including limited partnerships), societies, trusts, corporations, limited liability companies or other legal entities, including public or governmental bodies, as well as natural persons;

(e)     Each reference in this Agreement to a particular person shall be deemed to include a reference to such person's successors and permitted assigns;

(f)     Any headings preceding the texts of any Section of this Agreement, and any table of contents or marginal notes appended to copies hereof are intended, solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect;

(g)     If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any of the remaining provisions thereof;

(h)     The terms "herein", "hereunder", "hereby", "hereto", and any similar terms as used in this Agreement refer to this Agreement; the term "heretofore" means before the date of execution of this Agreement; and the term "hereafter" shall mean after the date of execution of this Agreement;

(i)     If any clause, provision or section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or section of this Agreement, then the clause, provision or section containing the more specific provisions shall control and govern with respect to such apparent conflict;

(j)     Unless otherwise specified, (i) all accounting terms used herein or in any Loan Document shall be interpreted in accordance with GAAP, (ii) all accounting determinations and computations hereunder or thereunder shall be made in accordance with GAAP and (iii) all financial statements required to be delivered hereunder or thereunder shall be prepared in accordance with GAAP;

(k)     An Event of Default that occurs shall exist or continue or be continuing unless such Event of Default is waived by Lender in accordance with the terms of this Agreement;

{00154593.DOC; 1}

EXECUTION COPY

(l)    The word "and" when used from time to time herein shall mean "or" or "and/or" if such meaning is expansive of the rights or interests of Lender in the given context;

(m)    All references herein and in the other Loan Documents to times of day shall refer to Los Angeles, California time, unless otherwise specified to the contrary; and

(n)    No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by reason of such party or his or its counsel having, or being deemed to have, structured or drafted such provision.

## SECTION 2. LOANS

**2.1    Loans**. The terms and provisions of Section 1(c) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

**2.2    Maximum Credit**. The aggregate principal amount of the Loans shall not exceed the amount of the Maximum Credit.

**2.3    Use of Proceeds**. Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule.

**2.4    Repayment**. Borrower shall repay the Loans and other Obligations in accordance with this Agreement and the Note.

**2.5    ACH**. In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("ACH") to all deposit accounts maintained by Borrower, wherever located. At the request of the Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) any ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waives any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has so communicated with and instructed the institution(s) set forth in Section 1(e) of the Loan Agreement Schedule.

## SECTION 3. INTEREST, FEES AND CHARGES

**3.1    Interest**. Interest on the Loans shall accrue as set forth in Sections 3(a) and 3(b) of the Loan Agreement Schedule.

**3.2    Fees**. Borrower shall pay Lender, or Lender's designee, the fees set forth in Section 3(c) of the Loan Agreement Schedule. Such fees, other than the audit fees referenced therein, shall be

{00154593.DOC; 1}

13

deemed fully earned on the date hereof, shall be paid from Loan proceeds, and not be subject to rebate or proration for any reason.

3.3    **Fees and Expenses**. Borrower shall pay, on Lender's demand, all costs, expenses, filing fees and taxes payable in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, defense and enforcement of the Loan Documents, Lender's rights in the Collateral, and all other existing and future agreements or documents contemplated herein or related hereto, including any amendments, waivers, supplements or consents which may now or hereafter be made or entered into in respect hereof, or in any way involving claims or defenses asserted by Lender or claims or defenses against Lender asserted by Borrower or any third party directly or indirectly arising out of or related to the relationship between Borrower and Lender, including, but not limited to the following, whether incurred before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar or successor statute: (a) all costs and expenses of filing or recording (including UCC Financing Statement and mortgage filing fees); (b) all title insurance and other insurance premiums, appraisal fees, fees incurred in connection with any environmental report and audit, survey and search fees and charges; (c) all fees relating to the wire transfer of loan proceeds and other funds and fees for returned checks; and (d) all costs, fees and disbursements of counsel to Lender. If any fees, costs or charges payable to Lender hereunder are not paid when due, such amounts shall be added to the principal amount of the Revolving Loans and accrue interest at the Default Interest Rate until paid.

3.4    **Savings Clause**. It is intended that the Interest Rate and the Default Interest Rate shall never exceed the maximum rate, if any, which may be legally charged in the State of California for loans made to corporations (the **"Maximum Rate"**). If the provisions for interest contained in the Note would result in a rate higher than the Maximum Rate, the interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to the Borrower.

### SECTION 4. TERM.

4.1    **Term**. This Agreement shall continue until all Obligations shall have been indefeasibly paid in full (the **"Term"**).

4.2    **Early Termination; Loan Prepayment Fees**.

(a)    Lender shall have the right to terminate this Agreement at any time upon or after the occurrence of an Event of Default.

(b)    Borrower may prepay the Loans as set forth in Section 4(b) of the Loan Agreement Schedule.

(c)    Borrower shall prepay the Loan as set forth in Section 4(d) of the Loan Agreement Schedule.

{00154593.DOC; 1}

14

Exhibit __1__ Page _24_

## SECTION 5. COLLATERAL.

**5.1    Security Interests in Borrower's Assets**. As collateral security for the payment and performance of the Obligations, Borrower hereby grants and conveys to Lender a first priority continuing security interest in and Lien upon all now owned and hereafter acquired property and assets of Borrower and the Proceeds and products thereof (which property, assets and Proceeds, together with all other collateral security for the Obligations now or hereafter granted to or otherwise acquired by Lender, are referred to herein collectively as the "**Collateral**"), including, without limitation, all property of Borrower now or hereafter held or possessed by Lender, and including the following:

       (a)     Accounts;

       (b)     Chattel Paper;

       (c)     Commercial Tort Claims;

       (d)     Deposit Accounts;

       (e)     Documents;

       (f)     Electronic Chattel Paper;

       (g)     Equipment;

       (h)     Fixtures;

       (i)     General Intangibles (including, without limitation the website domain names set forth on <u>Section 8.21 to the Borrower's Disclosure Schedule</u>);

       (j)     Goods;

       (k)     Instruments;

       (l)     Inventory, including, without limitation, the Rolling Stock;

       (m)    Investment Property;

       (n)     Letter-of-Credit Rights;

       (o)     Payment Intangibles;

       (p)     Promissory Notes;

       (q)     Software;

       (r)     Tangible Chattel Paper;

       (s)     Securities (whether certificated or uncertificated);

{00154593.DOC; 1}

Exhibit __1__ Page _25_

(t)    warehouse receipts;

(u)    cash monies;

(v)    tax and duty refunds;

(w)    Intellectual Property;

(x)    All present and future books and records relating to any of the above including, without limitation, all present and future motor vehicle titles, books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to any of the foregoing maintained with or by any other Person); and

(y)    Any and all products and Proceeds of the foregoing in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any or the foregoing.

**5.2    Financing Statements.** Borrower hereby authorizes Lender to file Financing Statements with respect to the Collateral in form acceptable to Lender and its counsel, and hereby ratify any actions taken by Lender prior to the date hereof to file such Financing Statements. Borrower shall, at all times, do, make, execute, deliver and record, register or file all Financing Statements and other instruments, acts, pledges, leasehold or other mortgages, amendments, modifications, assignments and transfers (or cause the same to be done), and will deliver to Lender such instruments and/or documentation evidencing items of Collateral, as may be requested by Lender to better secure or perfect Lender's security interest in the Collateral or any Lien with respect thereto. Borrower acknowledges that it is not authorized to file any Financing Statement or amendment or termination statement with respect to any Financing Statement without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender.

**5.3    License Grant.** The terms of Section 5(b) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

**5.4    Representations, Warranties and Covenants Concerning the Collateral.** Borrower covenants, represents and warrants (each of which representations and warranties shall survive execution of this Agreement and shall be true and correct from the time of Borrower's execution of this Agreement as if made on each date thereafter until all of the Obligations hereunder have been paid and performed in full, except for such representations and warranties that expressly reference a particular date) as follows:

(a)    (i) All of the Collateral owned by it is owned by it free and clear of all Liens (including any claim of infringement) except those in Lender's favor and Permitted Encumbrances and (ii) none of the Collateral is subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

{00154593.DOC; 1}

16

(b)     It shall not encumber, mortgage, pledge, assign or grant any Lien upon any Collateral or any other assets to anyone other than the Lender and except for Permitted Encumbrances.

(c)     The Liens granted pursuant to this Agreement, upon the filing of Financing Statements in respect of Borrower in favor of the Lender in the applicable filing office of the state of organization of Borrower, the recording of the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral which is created under such laws, constitute valid perfected first priority security interests in all of the Collateral in favor of the Lender, as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof.

(d)     No security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Encumbrances.

(e)     It shall not dispose of any of the Collateral whether by sale, lease or otherwise except for (i) the sale of Inventory in the ordinary course of business, provided, however, that Borrower shall not sell Rolling Stock without one (1) Business Days' prior written notice to Lender, and (ii) the disposition or transfer in the ordinary course of business of Equipment if consented to in advance in writing by Lender, in Lender's sole discretion, and then only to the extent that the proceeds of any such disposition are used to acquire replacement Equipment which is subject to the Lender's security interest or are used to repay the Obligations, as determined by Lender.

(f)     It shall defend the right, title and interest of the Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant the Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to the Lender, (ii) the prompt (but in no event later than three (3) Business Days following the Lender's request therefor) delivery to the Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification to third parties of the Lender's interest in Collateral at the Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve its and/or the Lender's interests in the Collateral.

(g)     It shall promptly, and in any event within three (3) Business Days after the same is acquired by it, notify the Lender of any Commercial Tort Claim acquired by it and, unless otherwise consented to by the Lender, it shall enter into a supplement to this Agreement granting to the Lender a Lien in such Commercial Tort Claim for the benefit of Lender.

(h)     It shall perform in a reasonable time all other steps requested by the Lender to create and maintain in the Lender's favor a valid perfected first Lien in all Collateral.

(i)     It shall notify the Lender promptly, and in any event within three (3) Business Days after obtaining knowledge thereof (i) of any material delay in its performance of any of its obligations to any Account Debtor; (ii) of any assertion by any Account Debtor of any material claims,

{00154593.DOC; 1}

17

Exhibit __1__ Page _27_

offsets or counterclaims; (iii) of any allowances, credits and/or monies granted by it to any Account Debtor; (iv) of all material adverse information relating to the financial condition of an Account Debtor; (v) of any material return of Goods; and (vi) of any loss, damage or destruction of any of the Collateral .

(j)     Section 5.4(j) of the Borrower's Disclosure Schedule contains a true and complete list of all Equipment owned by Borrower.  Borrower owns no Equipment other than as set forth in such Section (j).  It shall keep and maintain its Equipment in good operating condition, except for ordinary wear and tear, and shall make all necessary repairs and replacements thereof so that the value and operating efficiency shall at all times be maintained and preserved.  It shall not permit any such items to become a fixture to real estate or accessions to other personal property.

(k)     Section 5.4(k) of the Borrower's Disclosure Schedule lists all banks and other financial institutions at which it maintains deposits and/or other accounts, and such Schedule correctly identifies the name, address and telephone number of each such depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower shall not establish any depository or other bank account with any financial institution (other than the accounts set forth on Section 5.4(k) of the Borrower's Disclosure Schedule) without providing Lender with written notification thereof and providing similar information related thereto.

(l)     On the date hereof, its exact legal name (as indicated in the public record of its jurisdiction of organization), jurisdiction of organization, organizational identification number, if any, from the jurisdiction of organization, and the location of its chief executive office and all other offices or locations out of which it conducts business or operations, are specified on Section 5.4(l) of the Borrower's Disclosure Schedule.  It has furnished to the Lender its Organizational Documents and long-form good standing certificate as of a date which is within thirty (30) days of the date hereof.  It is organized solely under the law of the jurisdiction so specified and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction.  Except as otherwise indicated on Section 5.4(l) of the Borrower's Disclosure Schedule, the jurisdiction of its organization of formation is required to maintain a public record showing it to have been organized or formed.  Except as specified on Section 5.4(l) of the Borrower's Disclosure Schedule, it has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate or company structure in any way (e.g., by merger, consolidation, change in form or otherwise) within the last five years and has not within the last five years become bound (whether as a result of merger or otherwise) as a grantor under a security agreement entered into by another Person, which has not heretofore been terminated.

(m)     Borrower shall maintain and keep all of its books and records concerning the Collateral at its executive offices listed in Section 5.4(l) of the Borrower's Disclosure Schedule. Borrower shall not move Collateral from the Borrower's Premises, without the prior written consent of Lender.

(n)     It will not, except with Lender's prior written consent and upon delivery to the Lender of all additional financing statements and other documents and legal opinions requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein: (i) change its jurisdiction of organization or the location of its chief executive office from that referred to in Section 5.4(l) of the Borrower's Disclosure Schedule; or (ii) change its name, identity or organizational structure.  Borrower shall update such Section 5.4(l) of the Borrower's Disclosure Schedule to maintain

{00154593.DOC; 1}

18

Exhibit __1__ Page __28__

the accuracy of the representations set forth herein with respect thereto until the Obligations are paid in full.

(o)     Except pursuant to the terms hereof, none of the Collateral is subject to any prohibition against encumbering, pledging, hypothecating or assigning the same or requires notice or consent to Borrower's doing of the same.

(p)     (i) All Accounts represent complete bona fide transactions which require no further act under any circumstances on its part to make such Accounts payable by the Account Debtors, (ii) no Account is subject to any present, future contingent offsets or counterclaims, and (iii) no Account represents bill and hold sales, consignment sales, guaranteed sales, sale or return or other similar understandings or obligations of any Affiliate or Subsidiary of the applicable Borrower. It has not made, nor will it make, any agreement with any Account Debtor for any extension of time for the payment of any Account, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by it in the ordinary course of its business consistent with historical practice and as previously disclosed to the Lender in writing.

(q)     Borrower shall notify Lender if Borrower desires to add vehicles as Rolling Stock, and, upon Lender's approval of such addition in its sole discretion, Borrower shall submit to Lender an updated Exhibit 1.93, together with the Appraised Net Orderly Liquidation Value of each such added vehicle. Borrower shall keep and maintain its Rolling Stock in the same condition as inspected by Lender in the Appraisal, and shall make all necessary repairs and replacements thereof, as determined by Lender, so that the value of the Rolling Stock as set forth in the Appraisal shall at all times be maintained and preserved.

(r)     The additional representations, warranties and covenants set forth in Section 5(c) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

## SECTION 6. CONDITIONS TO INITIAL LOAN.

The obligation of Lender to make the initial Loan shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the following conditions precedent:

**6.1     Loan Documents.** Each of the Loan Documents shall have been duly and properly authorized, executed and delivered by Borrower and the other parties thereto and shall be in full force and effect as of the date hereof.

**6.2     Representations and Warranties.** Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement and in other Loan Documents shall be true and correct in all material respects as of the date hereof, provided that any such representation or warranty that is qualified by materiality shall be true and correct in all respects as of the date hereof.

**6.3     Certified Copies of Formation Documents.** Lender shall have received from Borrower, certified by a duly authorized officer to be true and complete on and as of a date which is not

{00154593.DOC; 1}

Exhibit __1__ Page _29_

EXECUTION COPY

more than ten (10) Business Days prior to the date hereof, a copy of each of the Organizational Documents of Borrower in effect on such date of certification.

**6.4    Proof of Action**. Lender shall have received from Borrower a copy, certified by a duly authorized officer to be true and complete on and as of the date which is not more than ten (10) Business Days prior to the date hereof, of the records of all corporate or limited liability company action taken by Borrower to authorize (a) its execution and delivery of each of the Loan Documents to which it is or is to become a party as contemplated or required by this Agreement, (b) its performance of all of its agreements and obligations under each of such documents, and (c) the incurring of the Obligations contemplated by this Agreement.

**6.5    Legal Opinion**. Lender shall have received a written legal opinion, addressed to Lender, dated the date hereof, from counsel for Borrower. Such legal opinion shall be acceptable to Lender and its counsel.

**6.6    Collateral**. Lender shall have obtained a first priority, perfected security interest in the Collateral of Borrower.

**6.7    Insurance**. Lender shall have received evidence of insurance, additional insured and loss payee endorsements required hereunder and under the other Loan Documents, in form and substance satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as additional insured and loss payee.

**6.8    Validity of Collateral Representation**. Lender shall have received a statement by the appropriate officers of Borrower which shall represent and certify the validity of the Collateral.

**6.9    ACH Agreement**. Lender shall have received from Borrower an agreement executed by Borrower which irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system to all deposit accounts maintained by Borrower, wherever located.

**6.10    IRS Form 4506**. Lender shall have received from Borrower an executed Form 4506 to be submitted to the Internal Revenue Service which shall grant Lender access to Borrower's tax returns.

**6.11    IRS Form W-9**. Lender shall have received from Borrower an executed Form W-9 to be submitted to the Internal Revenue Service which shall allow Lender to verify Borrower's tax identification number(s).

**6.12    Pay Proceeds Letter**. Borrower shall have delivered to Lender a pay proceeds letter with respect to the disbursement of the proceeds of the initial Loan in form and substance satisfactory to Lender, which letter shall provide for, among other things, the payment or reimbursement of all costs and expenses incurred by Lender in connection with this Agreement and the other Loan Documents.

**6.13    Additional Deliveries**. Borrower shall have delivered to Lender such other documents and instruments reasonably requested by Lender, including, without limitation, the documents set forth on Section 6 of the Loan Agreement Schedule.

{00154593.DOC; 1}

Exhibit __1__ Page 30

EXECUTION COPY

## SECTION 7. CONDITIONS TO MAKING ALL LOANS.

If it is contemplated in this Agreement that more than one advance will be made by Lender under Section 2.1 hereof, the obligations of Lender to make all Loans hereunder shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the following conditions precedent:

**7.1    Applications and Compliance**. The application for such Loans shall have been made by Borrower to Lender in accordance with the applicable provisions of this Agreement and in compliance with all provisions of this Agreement.

**7.2    Representations and Warranties**. Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement or in other Loan Documents shall have been true and correct in all material respects when made (provided that any such representation or warranty that is qualified as to materiality shall be true and correct in all respects), shall, for all purposes of this Agreement, be deemed to be repeated on and as of the date of each Loan by Lender hereunder and shall be true and correct in all respects on and as of each such date, except to the extent that any of such representations and warranties relate, by the express terms thereof, solely to a date prior to the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer of Borrower with respect to the foregoing in form and substance satisfactory to Lender.

**7.3    Performance, etc**. Borrower shall have duly and properly performed, complied with and observed each of its covenants, agreements and obligations contained in this Agreement and in any other Loan Documents on the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender. No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

## SECTION 8. REPRESENTATIONS AND WARRANTIES.

Borrower hereby represents and warrants to Lender, knowing and intending that Lender shall rely thereon in making the Loans contemplated hereby (each of which representations and warranties shall survive execution of this Agreement and shall be true and correct from the time of Borrowers' execution of this Agreement as if made on each date thereafter until all of the Obligations hereunder have been paid and performed in full, except for such representations and warranties that expressly reference a particular date), that:

**8.1    Existence**:

(a)    Borrower (i) is a corporation or limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) is in good standing in all other jurisdictions in which it is required to be qualified to do

{00154593.DOC; 1}

21

business as a foreign corporation or limited liability company, (iii) has all requisite corporate or limited liability company power and authority and full legal right to own or to hold under lease its properties and to carry on the business as presently engaged and (iv) Borrower has been issued all required federal, state and local licenses, certificates or permits necessary, required or appropriate to the operation of its business.

(b)    Borrower has corporate or limited liability company power and authority and has full legal rights to enter into each of the Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under each of such documents.

**8.2    No Violation, etc.** The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, the performance by Borrower of all of its agreements and obligations under each of such documents, and the incurring by Borrower of all of the Obligations contemplated by this Agreement, have been duly authorized by all necessary corporate or limited liability company actions on the part of Borrower and, if required, its shareholders, and do not and will not (a) contravene any provision of Borrower's Organizational Documents or this Agreement (each as from time to time in effect), (b) conflict with, or result in a breach of the terms, conditions, or provisions of, or constitute a default under, or result in the creation of any Lien upon any of the property of Borrower under, any agreement, mortgage or other instrument to which Borrower is or may become a party, (c) violate or contravene any provision of any law, regulation, order, ruling or interpretation thereunder or any decree, order or judgment or any court or governmental or regulatory authority, bureau, agency or official (all as from time to time in effect and applicable to such entity), (d) other than waivers required from Borrower's landlords, require any waivers, consents or approvals by any third party, including any creditors or trustees for creditors of Borrower, or (e) require any approval, consent, order, authorization, or license by, or giving notice to, or taking any other action with respect to, any Governmental Authority.

**8.3    Binding Effect of Documents, etc.** Borrower has duly executed and delivered each of the Loan Documents to which Borrower is a party, and each of the Loan Documents is valid, binding and in full force and effect. The agreements and obligations of Borrower as contained in each of the Loan Documents constitute, or upon execution and delivery thereof will constitute, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject, as to the enforcement of remedies only, to limitations imposed by federal and state laws regarding bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights and remedies generally, and by general principles of law and equity.

{00154593.DOC; 1}

**8.4    No Events of Default.**

(a)    No Event of Default has occurred and is continuing and no event has occurred and is continuing and no condition exists that would, with notice or the lapse of time, or both, constitute an Event of Default.

(b)    Borrower is not in default under any Material Contract to which Borrower is a party or by which Borrower or any property of Borrower is bound.

(c)    Borrower's execution, delivery and performance of and compliance with this Agreement and the other Loan Documents will not, with or without the passage of time or giving of notice, result in any material violation of law, or be in conflict with or constitute a default under any term or provision, or result in the creation of any Lien upon any of Borrower's properties or assets or the suspension, revocation, impairment, forfeiture or nonrenewal, of any permit, license, authorization or approval applicable to Borrower, or any of its businesses or operations or any of its assets or properties.

**8.5    No Governmental Consent Necessary.** No consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any Governmental Authority is required with respect to the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party.

**8.6    No Proceedings.** There are no actions, suits, or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower in any court or before any Governmental Authority which, if adversely determined, would have an adverse effect on the ability of Borrower to perform its obligations under this Agreement or the other Loan Documents to which it is a party.

**8.7    No Violations of Laws; Licenses and Permits.** Borrower has conducted, and is conducting, its Business, so as to comply in all material respects with all applicable federal, state, county and municipal statutes and regulations. Neither Borrower nor any officer, director, manager, member or shareholder of Borrower is charged with, or so far as is known by Borrower, is under investigation with respect to, any violation of any such statutes, regulations or orders, which could have a Material Adverse Effect. Borrower has been issued all required federal, state and local licenses, certificates or permits required for the operation of its business.

**8.8    Use of Proceeds of the Loans.** Proceeds from the Loans shall be used only for those purposes set forth in this Agreement. No part of the proceeds of the Loans shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of any statute or regulation. In particular, without limitation of the foregoing, no part of the proceeds from the Loans is intended to be used to acquire any publicly-held stock of any kind.

**8.9    Financial Statements; Indebtedness.**

(a)    The balance sheet of Borrower as of December 31, 2011 and the related statement of operations and stockholders' equity (together with the related notes) for the year ended

{00154593.DOC; 1}

23

December 31, 2011, and the balance sheet of Borrower as of March 31, 2012 and the related statement of operations, and stockholders' or members' equity (together with the related notes) for the three months ended March 31, 2012 (collectively, the "**Financial Statements**"), fairly present, as of the date thereof, the financial position of Borrower, and the results of its operations, cash flows and stockholders' equity in all material aspects.

(b)      Except as shown on the most recent Financial Statements, (i) Borrower has no Indebtedness as of the date hereof which would adversely affect the financial condition of either Borrower or the Collateral, and (ii) Borrower has no liabilities, contingent or otherwise, except those which, individually or in the aggregate, are not material to the financial condition or operating results of Borrower.

**8.10    Changes in Financial Condition**.  Since the Balance Sheet Date, there has been no material adverse change and no material adverse development in the business, properties, operations, condition (financial or otherwise), results of operations or prospects of Borrower.  Since the Balance Sheet Date, Borrower has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, outside of the ordinary course of business, (iii) had capital expenditures outside of the ordinary course of business, (iv) engaged in any transaction with any Affiliate or (v) engaged in any other transaction outside of the ordinary course of business.

**8.11    Equipment**.  Borrower shall keep its Equipment in good order and repair, and in running and marketable condition, ordinary wear and tear excepted.

**8.12    Taxes and Assessments**.

(a)      Borrower has paid and discharged when due all taxes, assessments and other governmental charges which may lawfully be levied or assessed upon its income and profits, or upon all or any portion of any property belonging to it, whether real, personal or mixed, to the extent that such taxes, assessment and other charges have become due.  Borrower has filed all tax returns, federal, state and local, and all related information, required to be filed by it.

(b)      Borrower shall make all payments to be made by it hereunder without any Tax Deduction (as defined below), unless a Tax Deduction is required by law. If Borrower is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it shall promptly notify Lender.  If a Tax Deduction is required by law to be made by Borrower, the amount of the payment due from Borrower shall be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required. If Borrower is required to make a Tax Deduction, Borrower shall make the minimum Tax Deduction allowed by law and shall make any payment required in connection with that Tax Deduction within the time allowed by law. Within thirty (30) days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, Borrower shall deliver to Lender evidence satisfactory to Lender that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

(c)      "**Tax Deduction**" means a deduction or withholding for or on account of a Tax from a payment under a Loan Document. "**Tax**" means any tax, levy, impost, duty or other charge or

EXECUTION COPY

withholding of a similar nature, including any income, franchise, stamp, documentary, excise or property tax, charge or levy (in each case, including any related penalty or interest).

**8.13   ERISA.**  Borrower is in compliance in all material respects with the applicable provisions of ERISA and all regulations issued thereunder by the United States Treasury Department, the Department of Labor and the Pension Benefit Guaranty Corporation.

**8.14   Environmental Matters.**

(a)     Borrower has duly complied with, and its facilities, business assets, property, leaseholds and equipment are in compliance in all respects with, the provisions of all Environmental Laws.

(b)     Borrower has been issued all required federal, state and local licenses, certificates or permits required under Environmental Laws for the operation of its business.

**8.15   United States Anti-Terrorism Laws; Holding Company Status.**

(a)     In this Section 8.15:

"**Anti-Terrorism Law**" means each of:  (i) Executive Order No. 13224 of September 23, 2001  Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the "**Executive Order**"); (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (iii) the Money Laundering Control Act of 1986, Public Law 99-570; and (iv) any similar law enacted in the United States of America subsequent to December 31, 2004.

"**holding company**" has the meaning given to it in the United States Public Utility Holding Company Act of 1935, and any successor legislation and rules and regulations promulgated thereunder.

"**investment company**" has the meaning given to it in the United States Investment Company Act of 1940.

"**public utility**" has the meaning given to it in the United States Federal Power Act of 1920.

"**Restricted Party**" means any person listed: (i) in the Annex to the Executive Order; (ii) on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or (iii) in any successor list to either of the foregoing.

(b)     Borrower is not (i) a holding company or subject to regulation under the United States Public Utility Holding Company Act of 1935; (ii) a public utility or subject to regulation under the United States Federal Power Act of 1920; (iii) required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or (iv) subject to
{00154593.DOC; 1}

25